IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

WILLIE SIMPSON,

                       Plaintiff,

        v.

SARA MASON, DANE ESSER,
SHAWN GALLINGER, C.O. GODFREY,
TRAVIS PARR, SGT. PRIMMER,
CAPTAIN FLANNERY, GARY BOUGHTON,
THERAN GAGE, CHAD WINGER,
CHRISTOPHER FOLEY, RONALD TORGERSON,
LUCAS RUNICE, THOMAS BELZ,
MICHAEL SHERMAN, MICHAEL COCKCROFT,
LEVERNE WALLACE, MATHEW SCULLION,
KEITH WEIGEL, C.O. KERSTEN, ELLEN RAY,
and WILLIAM BROWN,

                       Defendants.

OPINION & ORDER

13-cv-776-jdp

---

In this case, plaintiff Willie Simpson, an inmate currently housed at the Waupun Correctional Institution, is proceeding on claims that defendant prison officials at the Wisconsin Secure Program Facility (WSPF) made constant threats to harm or kill him, and assaulted him twice. In particular, plaintiff states that defendants beat him, sexually assaulted him during strip searches, and forced him to crawl into his cell. In a March 30, 2015 order, I dismissed plaintiff's excessive force claims regarding the first alleged assault (taking place on July 25, 2013) for failure to exhaust administrative remedies, and gave plaintiff a chance to explain why his strip search claim concerning that incident should not also be dismissed for that reason. Dkt. 98, at 15-16. Plaintiff failed to respond regarding the exhaustion of his strip search claim, so I will dismiss that claim.

Also in the March 30 order, I denied in part plaintiff's motion for preliminary injunctive relief. *Id*. at 17. Because plaintiff had been transferred out of WSPF, I directed the parties to provide supplemental briefing on whether preliminary injunctive relief could still be appropriate. *Id*. at 17-18. After considering the parties' supplemental briefing, I will deny plaintiff's motion.

Currently before the court is defendants' motion for summary judgment.[1] During the course of briefing the summary judgment motion, plaintiff twice filed motions for extensions of time to file his response, but followed those motions with his summary judgment response, which I will accept. The motions for extension of time will be denied as moot.

After considering the parties' summary judgment submissions, I will deny in large part defendants' motion on plaintiff's claims regarding excessive force, an unlawful strip search, and being humiliated by having to crawl into his cell. I will also deny defendants' motion regarding plaintiff's claim that defendants have repeatedly threated him with harm. I will grant defendants' motion as to certain portions of plaintiff's claims as explained below. I will also reset the schedule and set a new trial date.

FINDINGS OF FACT

The following facts are drawn from the parties' summary judgment materials and previous documents submitted in this litigation, and are undisputed unless noted otherwise.

Plaintiff Willie Simpson is a prisoner in the custody of the Wisconsin Department of Corrections (DOC). He is currently incarcerated at the Waupun Correctional Institution.

---

[1] Plaintiff informs the court that he has not received defendants' summary judgment reply. *See* Dkt. 151. I will direct the clerk of court to send plaintiff a copy of those documents.

However, at the times relevant to this case, he was incarcerated at the Wisconsin Secure Program Facility, located in Boscobel, Wisconsin.

At the times relevant to the case, all defendants were employees of the DOC at WSPF. Dane Esser was a lieutenant. Wayne Primmer, Michael Sherman, Laverne Wallace, Mathew Scullion, and Chad Winger were correctional sergeants. Theran Gage, Ronald Torgerson, Lucas Runice, Travis Parr, Shawn Gallinger, Jason Godfrey, Thomas Belz, Michael Cockroft, Keith Wiegel, Paul Kersten, and Christopher Foley were correctional officers. Ellen Ray and William Brown were institution complaint examiners.

Plaintiff's complaint discusses two alleged assaults, taking place on July 25, 2013, and August 12, 2013. With regard to the July 25, 2013, incident, plaintiff alleges that defendants Mason, Flannery, Godfrey, Parr, and Gallinger beat him, tased him for no reason, and conducted an "anal search" of plaintiff to humiliate him. Dkt. 32, at 6; Dkt. 83, at 3.

The August 12, 2013 incident is discussed by the parties in much more detail. That day, WSPF Security Director Jerry Sweeney (a non-defendant) ordered plaintiff to be moved from cell 404 Alpha to cell 101 Alpha. Defendants say this was "due to perceptions that [plaintiff] was negatively affecting the inmates in surrounding cells." Dkt. 150, at 8, ¶ 10. Plaintiff says that non-defendant Segreant Overbo told him that he was being moved "to finish plaintiff off." *Id.*

Defendant Esser told plaintiff about the move and directed him to come to the door of his cell to be restrained. Plaintiff refused. Esser received authorization from Sweeney to use "non-lethal" force to move plaintiff to his new cell. Esser assembled a "cell extraction team" consisting of defendants Primmer, Gage, Winger, and Foley.

The team arrived at plaintiff's cell "in a show of force" to get him to come to the door to be restrained. Plaintiff complied, the team applied wrist and leg restraints, and plaintiff was taken to cell 101 Alpha. Plaintiff complied with the team's directive to place his hands outside the trap so the wrist restraints could be removed, but he would not place his feet outside the cell so that the leg restraints could be removed. The parties dispute whether plaintiff said, "Get the gas." *Id.* at 11, ¶ 17.

Defendant Esser received authorization from Sweeney to use non-lethal force to remove the leg restraints. Esser assembled another cell extraction team, including all of the defendants from the first team as well as defendants Runice and Torgerson. Runice operated a camera to record the extraction. However, because Runice recorded the cell extraction from the hallway, the video does not capture the events taking place inside the cell. Esser arranged for a member of the Health Services Unit staff to be available if needed.

The team arrived at plaintiff's cell door. Defendant Esser told plaintiff that he had permission to use force, and he asked plaintiff whether he would place his legs out of the cell so that the restraints could be removed. Plaintiff refused.[2] Esser told plaintiff that he was going to be placed in "control status" because of his non-compliance, but plaintiff still refused.

The team (with the exception of defendants Runice and Torgerson) entered the cell, forced plaintiff to the wall, onto his bed, and then onto the floor. Defendants state that once plaintiff was on the floor, he continued to resist the team's efforts to restrain him. Plaintiff

---

[2] Defendants state that plaintiff also responded, "Go get the gas," but plaintiff disputes this and it is not clear from the video that plaintiff said this. Defendants also state that "[t]here was a brief moment during the exchange when [plaintiff] said he would comply, but he quickly changed his mind and again refused restraint procedure directives," Dkt. 150, at 14, ¶ 25, but this is not evident from the video.

4

says that he "did not resist use of force and could not resist." *Id*. at 15, ¶ 25. Defendants state that they could not restrain plaintiff's wrists because of his continued resistance, so defendant Esser used a Taser to "appl[y] a quick drive stun to the back triceps area of [plaintiff's] right arm." *Id*. at 16, ¶ 31. Plaintiff states that he was not resisting at the time Esser used the Taser on him. Right before Esser's use of the Taser, plaintiff can twice be heard saying, "I am not resisting." Dkt. 116-1, at 4:59-5:03.

Eventually, restraints were placed on plaintiff's wrists. After the restraints were applied, the cell extraction team performed a "staff-assisted" strip search. I understand this to mean that the team chose not to conduct a "visual" search, in which the prisoner takes off his own clothes and manipulates his body so that staff can see he is not hiding contraband. Instead, plaintiff's clothes were cut off using safety shears. Defendants Gage, Foley, and Primmer restrained plaintiff while defendant Winger performed the search. Winger checked plaintiff's mouth, hair, ears, fingers, armpits, feet, and toes. Winger used "bladed" hands to check underneath plaintiff's penis and scrotum and between plaintiff's buttocks. Plaintiff did not dispute defendants' proposed findings describing the search in this way, or the proposed findings stating that the search was performed in accordance with DOC policies. However, he characterizes the search as a "staff-assisted rape." Dkt. 134, at 28. Plaintiff was physically compliant during the strip search, but he made verbal threats such as, "When I get out, and I pop your ass." Dkt. 116-1, at 7:28-7:30.

After the strip search was completed, plaintiff was given a towel to wear around his midsection, and a spit mask was placed over his mouth. The cell extraction team escorted plaintiff to the Health Services Unit. The nurse took plaintiff's blood pressure, cleaned his abrasions (the parties seem to agree that plaintiff suffered abrasions on his ankle and

shoulder), and scheduled a follow-up appointment for the next day. Simpson continued to insult staff during the health evaluation.

Plaintiff was taken back to cell 101 Alpha. Defendant Torgerson was not with the team at this time. Upon arrival at the cell door, plaintiff was directed to kneel so that his leg restraints could be removed. Plaintiff complied, but stated, "You're going to need more than that toy" (apparently referring to the Taser) and, "Fuck you, suck my dick." Dkt. 116-1, at 16:25-16:30. Defendant Esser directed plaintiff to take off the towel, remain on his knees, and crawl into the cell. The parties dispute the rationale for this directive. Defendants state it was for the safety of staff members, to prevent plaintiff from physically lashing out at staff with his legs, body or head. Plaintiff thinks it was to humiliate him.

Defendants state that plaintiff has a history of assaultive behavior, and they submit a video showing plaintiff, in a similar situation, while standing with hands restrained but not his feet, knocking down a correctional officer by elbowing him. Dkt. 116-2, at 7:15:20-7:15:24.

Plaintiff believes that the incidents discussed above are part of a pattern of threatening behavior by defendants. Plaintiff states that "between 1-1-2013 and October 2014 . . . [defendants] threatened to kill me without regard to any penological reason, calculated to harass me, humiliate me, abuse their power and cause unnecessary and wanton pain as punishment for my past confrontation with CO Thomas Belz" and that "[b]etween 7-25-2013 and 10-2-2014 [defendants] came to my cell routinely taunting and threatening me stating the use of the electronic taser on me on 7-25-2013 and 8-12-2013 fried me like a chicken and its not over they are going to kill me." Dkt. 148, at 1, 3.

6

Plaintiff filed a series of inmate grievances about prison staff harassing him and threatening to harm or kill him. Defendants Brown and Ray received these complaints. Under DOC policy, complaints about staff misconduct are not investigated directly by the institution complaint examiner, but rather forwarded to security staff after the prisoner provides a statement. Brown and Ray requested statements from plaintiff for each of his complaints and forwarded them on to security staff when plaintiff agreed to make a statement. On several occasions, plaintiff would not make a statement, so the complaints were dismissed.

Plaintiff was transferred from WSPF to the Waupun Correctional Institution on October 30, 2014.

ANALYSIS

To succeed on a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). All reasonable inferences from the facts in the summary judgment record must be drawn in the nonmoving party's favor. *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999). If the nonmoving party fails to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment for the moving party is proper. *Celotex*, 477 U.S. at 322.

7

**A. Claims regarding July 25, 2013 incident**

Plaintiff's excessive force and strip search claims center on two incidents: one on July 25, 2013 and one on August 12, 2013. In the court's previous order, I granted defendants' motion for summary judgment based on plaintiff's failure to exhaust his administrative remedies with regard to excessive force during the July 25, 2013 incident. Dkt. 98, at 15-16. Plaintiff's strip search claim regarding that incident was not part of the exhaustion motion because plaintiff had not yet been allowed to proceed on that claim. *Id*. at 16. Because the record showed that plaintiff failed to exhaust his grievance about the excessive force on that date and because it did not appear that he had filed any other grievances, it seemed almost certain that he had failed to exhaust his remedies with regard to the strip search claim as well. *Id*. I gave plaintiff an opportunity to show how he had exhausted that claim. Plaintiff failed to respond to the order. Accordingly, I will dismiss without prejudice his strip search claim regarding the July 25, 2013 incident for his failure to exhaust administrative remedies.

Because this was the only surviving claim against defendants Mason and Flannery, they will be dismissed from the case. Defendants Godfrey, Parr, and Gallinger remain part of the case with regard to their alleged threats to harm plaintiff, as explained in section C below.

**B. Claims regarding August 12, 2013 incident**

Plaintiff has three claims against defendants Esser, Primmer, Gage, Winger, Foley, Torgerson, and Runice regarding the August 12, 2013 cell extraction: (1) they used excessive force against him; (2) they cut off his clothes and conducted an "anal search" on him to humiliate him; and (3) they forced him to crawl into his new cell while threatening to use the Taser on him.

### 1. Excessive force

To prevail on a claim of excessive force against a correctional officer, a plaintiff must prove that the officer applied force "maliciously and sadistically for the very purpose of causing harm," rather than "in a good faith effort to maintain or restore discipline." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992) (*quoting Whitley v. Albers*, 475 U.S. 312, 320-21 (1986)). The factors relevant to this determination include (1) why force was needed; (2) how much force was used; (3) the extent of the injury inflicted; (4) whether the defendant perceived a threat to the safety of staff and prisoners; and (5) whether efforts were made to temper the severity of the force. *Whitley*, 475 U.S. at 321.

In the March 30, 2015 screening order, I described plaintiff's excessive force claim as one against defendants "for beating plaintiff, using a stun gun on him for no reason, and performing an anal search on him." The strip search part of the alleged Eighth Amendment violation belongs in its own analysis below. That leaves the beating and Taser components.

I understand the "beating" component of the claim to be based on the force used by the cell extraction team to take plaintiff to the floor. Correctional officers may use reasonable force to gain compliance from a noncompliant inmate. *See Guitron v. Paul*, 675 F.3d 1044, 1046 (7th Cir. 2012) ("Custodians must be able to handle, sometimes manhandle, their charges."); *Soto v. Dickey*, 744 F.2d 1260, 1267 (7th Cir. 1984) ("When an order is given to an inmate there are only so many choices available to the correctional officer. If it is an order that requires action by the institution, and the inmate cannot be persuaded to obey the order, some means must be used to compel compliance, such as a chemical agent or physical force.").

The video shows that plaintiff repeatedly would not comply with staff's orders to place his legs out of the cell. Physically subduing him to gain compliance was appropriate. Nowhere in the summary judgment materials does plaintiff describe gratuitous use of force that could be described as "beating" him. Rather, he focuses on the tasing, the strip search, and being forced to crawl into his new cell. I conclude that summary judgment must be granted to defendants on plaintiff's allegations that he was "beaten" by defendants.

The use of the Taser is a closer question. Defendants state that Esser used the Taser because plaintiff continued to resist their efforts to place his wrists in restraints even after he was on the floor. They also state that plaintiff "admits it was possible he was resisting when officers tried to restrain his wrists." Dkt. 150, at 18, ¶ 35 (citing Dkt. 34, at 47). Plaintiff states in his affidavit, "I was not resisting nor could I resist because I was overpowered 4 to 1, Esser shot me solely to harass me, humiliate me, abuse his power and cause wanton infliction of pain." Dkt. 148, at 2. I understand plaintiff to be saying that defendants Primmer, Gage, Winger, and Foley held him down while Esser tased him even though he was not resisting at that point.

If plaintiff was truly compliant, the use of the Taser would be a gratuitous use of force, and the differing stories of the parties would create a dispute for trial on the *Whitley* factors. But defendants argue that plaintiff's affidavit should not be considered under the "sham affidavit" rule. Dkt. 149, at 2 ("'It is well established in this Circuit that, as a general rule, a party may not create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony in the absence of . . . the unmistakable need to clarify prior ambiguous statements.'" (quoting *Gates v. Caterpillar, Inc.*, 513 F .3d 680,

688 n.5 (7th Cir. 2008))). I understand defendants to be arguing that plaintiff's affidavit testimony conflicts with his deposition testimony that it was possible he was resisting.

What follows is plaintiff's deposition testimony in context:

Q. Wrist restraints, did they try to put wrist restraints on?

A. Oh, yeah, they did.

Q. And you moved around to try to stop them from doing that, correct?

A. No. I didn't have a chance. I had -- I had three, four, maybe five, I don't know how many of them there was, holding me down, holding my arm and being shot. No, no, I wasn't resisting. I was in pain, but I wasn't resisting.

* * *

Q. Did you move your wrists in order to put them into a restrained position when they asked you to?

A. I can't recall.

Q. Is it possible that you didn't?

A. No, I can't say that it was possible that I refused to move my wrists to put them in restraints or not. I can't.

Q. Why?

A. If I say that I didn't, if I didn't, I don't know if that was correct or not, so I can't say.

Q. So you don't remember whether you put your hands in a position in order to be restrained by your wrists?

A. Right, I don't remember.

Q. And you don't remember whether the team did that easily or if they sensed resistance from you?

A. No. Like I said, one of the guards said to me when I went to HSU that I didn't resist, I believe, the big guy. If I see his face, I'll remember him. So I don't think I was resisting.

* * *

11

Q. And you claim that one of the people there said that you hadn't been resisting?

A. Yes, I believe the big guy, the big guard.

Q. Which one?

A. I can't remember his face -- well, I can remember his face, but I don't remember his name.

Q. If he hadn't said that to you, would you be able to remember whether you complied with orders to put your wrists in a position to be restrained?

A. If I see the video, I'd probably remember.

Q. I'm asking you sitting here today, do you remember if you complied when officers tried to restrain your wrists while in the cell?

A. Can't recall.

Q. You can't recall one way or the other?

A. No.

Q. So it's possible you were resisting, correct?

A. It's possible. Anything is possible.

Dkt. 134, at 45-47.

Plaintiff starts by saying that we was not resisting, although even this is not entirely inconsistent with defendants' version—it is indeed possible for a person to struggle and resist even if being handled by four others. After being pressed about the events, plaintiff states that he did not remember what happened. In his affidavit opposing summary judgment, plaintiff appears to now remember what he could not recall in his deposition.

Although the sham affidavit rule has occasionally been applied to situations in which a witness fails to remember a matter during a deposition but later remembers it in an affidavit used in an effort to defeat summary judgment, *Yeager v. Bowlin*, 693 F.3d 1076,

1080-81 (9th Cir. 2012); *Makeda-Phillips v. White*, 2015 WL 3464313, at *6 (C.D. Ill. May 29, 2015), this doctrine must be used with caution because "[c]redibility and weight are issues of fact for the jury, and [courts] must be careful not to usurp the jury's role." *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 638 (7th Cir. 2004) (citing *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1170 (7th Cir. 1996)). Defendants do not develop an argument for why the doctrine should be applied given plaintiff's particular inconsistent answers here, or address the common-sense argument against invocation of the rule in memory-based situations—memories simply often come and go. *See E.E.O.C. v. Aurora Health Care, Inc.*, 2015 WL 2344727, at *5 n.28 (E.D. Wis. May 14, 2015) (witness's "general lack of memory at a specific time is not specifically contradicted by her later memory. Indeed, that is often the nature of memory."). In addition, plaintiff's newer recollection of events seems to match his contemporaneous statements (taken from the video) that he was not resisting. Accordingly, I will not throw out plaintiff's affidavit testimony.

Defendants also liken this case to *Boyd v. Pollard*, 2015 WL 4272098, (7th Cir. July 15, 2015), in which the court of appeals affirmed the grant of summary judgment on an excessive force case even though the video in that case did not fully capture the events at issue:

> Regarding Boyd's excessive-force claim we are in agreement with the district court. Boyd argues that there are disputed facts about what happened when he suddenly dropped to the ground after the group arrived in the new wing of segregation and what occurred inside the new cell, events which were not captured on camera. And if a jury believes his version, Boyd continues, it reasonably could find that Beahm used excessive force.
>
> We disagree. . . . From the video, when Boyd and the guards reach the other wing of the segregation unit, we cannot tell why or how Boyd ended up on the ground and what occurred when Boyd and the guards entered his new cell. Initially it may appear

13

> as though this fact dispute would preclude summary judgment.
> However summary judgment would have been improper only if
> a jury reasonably could find excessive force based on Boyd's
> assertions. We conclude that no juror who viewed the video
> could reasonably conclude—given the professional behavior of
> the guards and minor injury sustained by Boyd—that the
> guards, when outside the camera's view, attacked Boyd. For
> instance, Boyd asserts that he was bodyslammed onto a concrete
> floor and sustained numerous blows to his head and face so
> severe as to cause blood to drip down his face. But Boyd's
> injury—a small laceration above his eye—was minimal and
> cannot even be seen bleeding. If Boyd's account was accurate,
> that minor cut would not have been his sole injury.

*Boyd*, 2015 WL 4272098, *2 (internal citations omitted). But while Boyd's self-reported

injuries were flatly inconsistent with the remainder of the video, the parties do not dispute

that defendant Esser tased plaintiff. The question here is whether the tasing was appropriate

at the time. Although the portion of the events visible on the video shows that defendants

acted with professionalism (for instance, the audio captures no slurs or other abusive

language that might suggest an attempt at intentional harm), that does not necessarily

preclude the use of excessive force inside the cell. Based on plaintiff's testimony and his

contemporaneous remarks that he was not resisting, I conclude that plaintiff has raised a

genuine issue of material fact on his excessive force claim as it pertains to the decision to tase

him.

Defendants make a brief reference to qualified immunity with regard to the excessive

force claim. Dkt. 111, at 25 ("there is no case law that would support a finding of

unconstitutional conduct in defendants' decisions to use force"). Qualified immunity protects

government officials "from liability for civil damages insofar as their conduct does not violate

clearly established statutory or constitutional rights of which a reasonable person would have

known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). In deciding whether a right is

14

"clearly established," courts ask "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). The right must be established "at the time of the alleged violation." *Williams v. City of Chicago*, 733 F.3d 749, 758 (7th Cir. 2013).

In making their argument, defendants seem to assume that plaintiff was not compliant. Because there is a triable issue of fact about whether plaintiff was resisting at the time he was tased, I conclude that qualified immunity does not apply to this claim. Case law shows that there is "clearly established law" forbidding prison officials from tasing inmates for no reason. *See, e.g.*, *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 733 (7th Cir. 2013) (discussing cases involving use of Taser by police and correctional officers). Accordingly, I will deny defendants' motion for summary judgment as it pertains to Esser's use of the Taser. I will also deny the motion as it pertains to defendants Primmer, Gage, Winger, and Foley, for assisting Esser in the use of force or failing to intervene to stop him. *See Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000) ("Under [§ 1983], police officers who have a realistic opportunity to step forward and prevent a fellow officer from violating a plaintiff's rights through the use of excessive force but fail to do so have been held liable."). I will grant the motion as to defendants Runice and Torgerson, because they were not present in the cell and could not have plausibly intervened against Esser's use of the Taser.

### 2. Strip search

Plaintiff brings a claim regarding the "staff-assisted" strip search performed after the tasing. A strip search violates the Eighth Amendment when it is "conducted in a harassing manner intended to humiliate and inflict psychological pain." *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003); *Fillmore v. Page*, 358 F.3d 496, 505 (7th Cir. 2004). Stated another

way, the question is whether there was a legitimate penological reason for both the search and its scope. *Whitman v. Nesic*, 368 F.3d 931, 934-35 (7th Cir. 2004); *see also Vasquez v. Raemisch*, 480 F. Supp. 2d 1120, 1131-32 (W.D. Wis. 2007) (stating that case law "supports a conclusion of heightened protection for a manual as opposed to visual inspection."). Plaintiff was allowed to proceed on claims regarding both the decision to subject him to such an invasive search and the manner in which the search itself was executed. Dkt. 98, at 5.

This court has stated that in some circumstances, prison officials could violate the Eighth Amendment by giving a prisoner a "staff-assisted" strip search rather than giving him a chance to comply with a visual search. *See, e.g., Vasquez v. Raemisch*, 480 F. Supp. 2d 1120, 1131 (W.D. Wis. 2007); *Cherry v. Frank*, 2003 WL 23205817, at *11 (W.D. Wis. Dec. 4, 2003), *aff'd*, 125 F. App'x 63 (7th Cir. 2005). However, prison officials do not violate the Eighth Amendment when they have legitimate reasons to deny a prisoner that choice. *See, e.g., Lindsey v. Esser*, No. 14-cv-166-jdp, at *8-9 (W.D. Wis. Sept. 2, 2015) ("[T]here is no ironclad rule that every time a guard conducts a strip search, he or she must offer the inmate that choice. Such an inflexible rule would be unworkable in the context of prisons, as there will often be circumstances under which it would be unsafe, unwise, or impractical to present an inmate with this choice."); *Cherry*, 2003 WL 23205817, at *11 (prisoner's initial resistance to search required staff to handcuff him during search, making visual inspection impossible).

As discussed above, the undisputed testimony and video evidence shows that plaintiff was combative and threatened officers, giving them ample reason to keep plaintiff restrained during the strip search as opposed to allowing him to manipulate his own body. However, defendants could still be liable under the Eighth Amendment if they chose to perform the

16

staff-assisted search on plaintiff to humiliate him rather than to serve penological interests. *Mays v. Springborn*, 719 F.3d 631, 633-34 (7th Cir. 2013) ("There may have been a valid penological reason for the search, yet it may not have been the reason or a reason; the reason may have been to humiliate the plaintiff."). As discussed above, there is already a triable issue over whether defendants used excessive force in tasing plaintiff. If a jury were to conclude that defendants tased plaintiff for no legitimate reason, it would seem to color the analysis of defendants' subsequent actions, making it more likely that the staff-assisted strip search was selected because it is inherently more intrusive and humiliating, rather than because it was necessary to serve legitimate penological interests. This leads me to conclude that there is a disputed issue of fact over defendants' intent in choosing the staff-assisted strip search.

As with the excessive force claim, defendants raise a qualified immunity argument, but it fails for similar reasons to their argument about the excessive force claim. No reasonable officer would think that it was lawful to order a staff-assisted strip search for the purpose of humiliating a prisoner. Accordingly, I will deny defendants' motion for summary judgment with regard to the decision to undertake a staff-assisted strip search. As with the tasing claim, I will grant the motion regarding defendants Runice and Torgerson, because they were not present in the cell when the tasing took place and do not appear to have had any input into the decision to perform the staff-assisted search.

As for the propriety of defendants' conduct in performing the search, the video evidence is of no use, because the camera did not capture the events inside the cell. Unlike the excessive force claim, the nature of plaintiff's and defendants' actions that were captured on the video prior to the extraction itself lends no insight into the legitimacy of defendants' response. While a particularly dangerous situation or resistive prisoner might call for more

force from defendants, there are no circumstances under which it would be appropriate for defendants to sexually assault a prisoner.

It is somewhat difficult to tell exactly what part of the strip search plaintiff believes violated his rights. Defendants argue that the strip search was performed in accordance with DOC policies, although they do not explain in great detail what this means. I do understand defendants to be saying that defendant Winger followed policy by "us[ing] bladed hands to check underneath Simpson's penis, scrotum and between Simpson's buttocks." Dkt. 150, at 20, ¶ 40. In the proposed findings of fact, plaintiff does not dispute defendants' assertion about Winger following policy or his use of bladed hands.

In his complaint, plaintiff states that defendants conducted an "anal search." Dkt. 32, at 7. One might infer from this allegation that defendants penetrated his anus, which would appear to violate prison regulations. Wis. Admin. Code § DOC 306.17(3)(b) "Medical staff shall conduct body cavity searches. Medical staff may conduct a body cavity search only if the warden approves. The warden shall approve if there is probable cause to believe that contraband is hidden in a body cavity."). Although prison officials do not automatically violate the Eighth Amendment by failing to follow prison rules, such a failure would bolster the theory that defendants used maximally invasive techniques to humiliate plaintiff rather than to serve legitimate penological purposes.

As one of their proposed findings, defendants cite the complaint in stating that plaintiff did not allege that defendants penetrated his anus during the search. Dkt. 150, at 21, ¶ 42. This seems to miss a reasonable inference from the allegation that defendants conducted an "anal search." Plaintiff does not dispute defendants' proposed finding that no anal penetration occurred, although it is unclear whether this means that plaintiff was

18

agreeing with defendants' characterization of the complaint, or whether he was agreeing that no anal penetration actually occurred. But in any event, because we are at the summary judgment stage, the precise allegations in the complaint are not dispositive. The question is what evidence the parties have provided about what happened during the search. Between his affidavits and deposition testimony, I do not understand plaintiff to be contending at summary judgment that defendants penetrated his anus.

Of course, this is not the only way that a strip search could violate the Eighth Amendment. *See, e.g.*, *Washington v. Hively*, 695 F.3d 641, 642-43 (7th Cir. 2012) (grant of summary judgment to defendants reversed where plaintiff alleged that "guard spent five to seven seconds gratuitously fondling the plaintiff's testicles and penis through the plaintiff's clothing and then while strip searching him fondled his nude testicles for two or three seconds."). Plaintiff states in his affidavit that his "genetals [sic] were fondalled [sic] and a [sic] anal search was conducted causing [him] emotional psychological pain." Dkt. 148, at 2.

The word "fondle" connotes an action more consistent with sexual assault than professional strip search. *See* The American Heritage Dictionary of the English Language 683 (4th ed. 2000) (defining "fondle" as "[t]o handle, stroke, or caress lovingly."). But plaintiff's deposition provides significantly more context to plaintiff's statement and gets to the heart of precisely what occurred that plaintiff believes violated his rights:

> A. They cut my clothes off of me and did a staff-assisted rape. What I call an anal search is staff-assisted rape. They call it a staff-assisted search. I call it a staff-assisted rape.
>
> Q. Explain that process to me.
>
> A. I don't know if they was doing it by the rules or not, but they grabbed my genitals and pretty much fondled my genitals and fondled my butt, saying that they're checking, checking for something. I was never given an opportunity to even allow them

19

to give me a chance to take my clothes off myself. I would have taken them off myself instead of going through that type of humiliation.

Q. Had you ever been strip searched before, staff-assisted.

A. Never. Wait a second, prior to that by Captain Mason. He did the same thing pretty much, humiliated me.

Q. Was it the same type of strip search, anything different?

A. Well, the difference was they didn't throw me down and do it right then and there. . . .

Q. Was that strip search, the hands-on physical part of the strip search, was that the same between your first search and the search on August 12th?

A. Yeah, they fondle your butt, open your butt up, they swipe a finger through your butt like you'd swipe a credit card down through a machine or something, grab your -- grab my genitals and lift them and fondle them and put me in the cell.

Q. When you say fondle the buttocks, does that mean they used their hands to spread the buttocks?

A. Yes, and fingered or swiped through or, well, that's what it felt like to me, like they swiped their fingers through the crack of my butt.

Q. While they were spreading your buttocks?

A. Yeah, that's what it felt like to me.

\* \* \*

Q. When they lifted your genitals, they used their hand, correct?

A. Yeah, yeah.

Q. And that was to see if anything was under?

A. No, no. I don't know what it was for, because I didn't have anything on me, so -- they had just taken me from a control cell, and in control cells you don't have anything. They've got to give you clothes. So I didn't have anything, so they couldn't have been checking for anything. I was in a cell with nothing.

20

Q. How long did they lift your genitals?

A. It seemed like forever to me, so I don't know how many minutes, seconds, hour. I don't know. It seemed like forever.

Q. How long did they spread your buttocks?

A. It seemed like forever, everlasting.

Q. For minutes or --

A. I don't -- it seemed like forever to me. I don't know whether it was minutes, seconds, but it seemed like forever.

\* \* \*

Q. And both of those strip search events had the same physical touching of your body?

A. Yeah, pretty much.

Q. There was nothing different about the way they touched your buttocks or scrotum in the two searches?

A. I can't recall the exact touching and feeling, but it could have been pretty much the same, it could have been different. I think it could have been a lot different, especially because I was on my stomach with the one with Dane Esser. I was on my stomach and he was holding me down and I was being shot, so that right there, I didn't like that at all.

Q. The way they touched your buttocks and the scrotum, was that the same between the two staff-assisted strip searches or don't you remember?

A. No, no. As far as the search, how they cut my clothes off, that was different. You asked me specifically, though, how they touched my butt?

Q. Correct.

A. Yeah, it seemed like they spread my butt cheeks apart and like their thumb was going down the middle of my crack of my butt or something. I don't know.

Q. Did they do that the same way both strip searches you had?

A. Looking in my butt and all that?

21

Q. Yes.

A. I believe so.

* * *

Q. And the way that they lifted your scrotum, was that different between the two searches or pretty much the same?

A. Again, I don't—okay. It could have been the same. It could have been different. As far as touching my butt and my scrotum, I don't know if it was exactly the same or not.

Q. Was it pretty similar, though?

A. It was similar, yeah. It was similar.

Q. There's nothing that you can think of today that jumps out in your mind as different between those searches in those areas?

A. Yeah. Oh, no, just the searches themselves, no, nothing that jumps out.

* * *

Q. So is your complaint about the strip search essentially that they didn't give you the opportunity to comply?

A. It's more than just that. They went beyond the strip search in my opinion.

Q. What is that opinion based on?

A. Based on what they did to me, cut my clothes off, fondled me.

Q. Is it your testimony that they shouldn't be allowed to touch your genitals in any manner?

A. I don't think they should. It's my opinion, but I don't think they should. I think that any anal searches or any of those things, they should be done by HSU or someone like that, just my opinion.

Q. Do you believe that it's sexual assault to spread somebody's butt cheeks?

22

A. According to Wisconsin Statute, it is. Without my permission, yes, it is. That's exactly what the statute says.

Q. So a correctional officer spreading your butt cheeks you believe is sexual assault?

A. I don't believe it. That's what the law says.

Q. What about—do you believe it?

A. Yes, I believe it. Why not?

Q. And do you believe that any touching of your genitals, including lifting your scrotum, is sexual assault?

A. Yes, I do.

Q. And that's what you meant by sexual assault in your filings with the Court, right?

A. Yes. If the law says they can't do that and that's sexual assault, then that's what it is. That's state statute.

* * *


Q. And you claim the sexual assault was spreading your butt cheeks, correct?

A. I see, yeah, "Assaulted me by cutting off my clothes, grabbing my butt cheeks, spreading them for their sadistic pleasure and to humiliate me."

Q. Do you know whether butt checks need to be spread for legitimate security purposes?

A. I'm not security. I don't know.

Q. So it's your personal opinion that spreading butt cheeks is sexual assault, correct?

A. No, I read the criminal statute which defines what sexual assault is, and I'll defer to that.

Q. But that's what you meant, the criminal statute, when you claim that that was a sexual assault?

23

A. Yeah, pretty much.

Dkt. 134, at 28-33, 71-73, 107-108.

Based on plaintiff's deposition testimony, no reasonable jury could conclude that defendants "fondled" his buttocks or testicles as that term is defined by the dictionary. Rather, plaintiff is saying that defendants touched him in an unwanted manner by lifting his testicles and spreading his buttocks. While forcibly lifting a man's testicles and spreading his buttocks would be sexual assault in the outside world, it is part and parcel of a staff-assisted strip search serving the legitimate penological purpose of keeping the prison secure by ensuring that no prisoner transports contraband. Plaintiff seems to equate *any* unwanted touching with sexual assault but this is simply not the standard for prison strip searches. *Calhoun*, 319 F.3d at 939 ("There is no question that strip searches may be unpleasant, humiliating, and embarrassing to prisoners, but not every psychological discomfort a prisoner endures amounts to a constitutional violation."). Nor does plaintiff describe any harassing, humiliating, or demeaning comments or behavior on the part of any prison staff during the search that might create an inference that particular techniques used during this search were done to humiliate him. Therefore, I conclude that no reasonable jury could conclude that the manner in the strip search was conducted, as opposed to the decision to conduct the staff-assisted search in the first place, violated plaintiff's Eighth Amendment rights. I will grant summary judgment to defendants on this portion of plaintiff's claim.

### 3.  Crawling into cell

The final component of plaintiff's claims regarding the August 12, 2013 cell extraction is his being forced to crawl into his new cell while being threatened with the Taser. I will address the claim under a standard similar to that of a strip search claim: whether defendants'

24

actions were meant to humiliate and inflict psychological pain on plaintiff or whether they were meant to serve legitimate penological purposes. *See, e.g.*, *Upthegrove v. Tubbs*, 2008 WL 5083866, at *3 (W.D. Wis. Nov. 17, 2008) (forcing prisoner to "kneel naked facing the corner of his wall for as long as 90 minutes" could violate Eighth Amendment (citing *Calhoun*, 319 F.3d at 940)).

Plaintiff was allowed leave to proceed on his claim because forcing a prisoner to crawl into his cell raises the inference that defendants meant to demean or humiliate plaintiff. But the facts provided by the parties show that defendants likely had a legitimate penological reason for doing so. Defendants show that plaintiff has a history of assaultive behavior, and they submit a video showing plaintiff, in a similar situation, while standing with hands restrained but not his feet, knocking down a correctional officer by elbowing him. Dkt. 116-2, at 7:15:20-7:15:24. The video of the August 12, 2013 incident shows that plaintiff was verbally abusive to defendants, including telling Esser, "You're going to need more than that toy" (apparently referring to the Taser), suggesting that he would continue to be physically resistive. *See* Dkt. 116-1, at 16:25-16:30.

However, the video also shows that defendant Esser directed plaintiff to take off the towel covering his midsection and that plaintiff crawled naked into the new cell, which for obvious reasons raises a stronger concern about the purpose of the directive being plaintiff's humiliation. There is also the matter of plaintiff's excessive force and strip search claims: if a jury were to conclude that defendants tased plaintiff for no legitimate reason and then conducted a staff-assisted strip search to humiliate him, it would raise the inference that the directive to crawl was intended to humiliate plaintiff as well. Therefore, for similar reasons to the strip search claim, I conclude that there is a disputed issue of fact over the decision to

make plaintiff crawl into his cell while naked. Defendants again raise a qualified immunity argument, but no reasonable prison official would think it was legal to direct a prisoner to crawl naked into his cell for the purpose of humiliating him. Unlike the tasing and strip search claims, I will not grant summary judgment regarding defendant Runice's involvement in this portion of the claim because he had a view of the events and could have intervened. I will grant summary judgment regarding Torgerson's involvement, as there is no evidence that Torgerson was present during this part of the incident. Because I am granting summary judgment regarding each of plaintiff's claims against Torgerosn, I will dismiss him from the case.

## C.  Ongoing threats

Plaintiff is proceeding on an Eighth Amendment claim that defendants Parr, Gallinger, Godfrey, Esser, Foley, Sherman, Cockcroft, Wallace, Scullion, Weigel, Kersten, and Belz made ongoing threats to harm or kill plaintiff. Usually, verbal harassment does not constitute cruel and unusual punishment. *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000). However, the type of threatening harassment plaintiff alleges may violate the Eighth Amendment when it involves "a credible threat to kill, or to inflict other physical injury." *Dobbey v. Ill. Dep't of Corr.*, 574 F.3d 443, 446 (7th Cir. 2009). This is a relatively undeveloped area of Eighth Amendment law. The Seventh Circuit has noted that "[t]he line between 'mere' harassment and 'cruel and unusual punishment' is fuzzy," *id.*, and has been reluctant to call threats "credible" unless "it is accompanied by something, such as the presence of a weapon or other sign of force, from which one could reasonably infer that the inmate 'suffered the terror of instant and unexpected death or serious injury.'"[3] *Lamon v.*

---

[3] This standard is called into question by a recent Seventh Circuit opinion, *Beal v. Foster*, No.

*Brown*, 2014 WL 7365867, at *6 (S.D. Ill. Dec. 23, 2014) (quoting *Northington v. Jackson*, 973 F.2d 1518, 1524 (10th Cir. 1992)). In *Dobbey*, the court distinguished the facts in that case— a correctional officer displayed a noose and looked at the plaintiff with "evil eyes," 574 F.3d at 446—from other cases that have supported Eighth Amendment claims:

> we think the incident with the noose and the "evil eyes" falls on the harassment side of the line because it was not a credible threat to kill, or to inflict any other physical injury. The case falls well short of *Burton v. Livingston*, 791 F.2d 97, 100-01 (8th Cir. 1986), where a prisoner alleged that a guard pointed a gun at him, cocked it, called him "nigger," and repeatedly threatened to shoot him, or *Irving v. Dormire, supra*, 519 F.3d at 449-50, where a prisoner alleged that a guard had threatened to kill him, repeatedly offered a bounty to any prisoner who would assault him, and gave a prisoner a razor blade with which to assault him.

*Id*.

---

14-2489, slip op. at 2 (7th Cir. Oct. 2, 2015), in which the court stated,

> The proposition that verbal harassment cannot amount to cruel and unusual punishment is incorrect. Suppose a prisoner is having severe headaches and he complains about them to a prison doctor, who writes him a prescription for a powerful drug. A malicious guard learns of this and tells the prisoner the following lie: "the doctor didn't tell you, but he told me: you have incurable brain cancer and will be dead in three months. Now let me tell you what he told me are the symptoms you will be experiencing as your cancer worsens." Or the guard, again lying, tells another prisoner: "I am sorry to have to inform you that your wife and children have been killed in a car crash." The harassment in both cases is purely verbal, yet as cruel (and, one hopes, as unusual) as in cases of physical brutalization of prisoners by guards. To attempt to draw a categorical distinction between verbal and physical harassment is arbitrary. In short, "the alleged pain [sufficient to constitute cruel punishment] may be physical *or psychological*." *Watison v. Carter*, 668 F.3d 1108, 1112 (9th Cir. 2012) (emphasis added).

This case does not factor into the qualified immunity analysis because the decision was issued after the alleged threats at issue in this case.

In the present case, I understand plaintiff to be saying that defendants repeatedly threatened him with harm or even death. In his affidavit, he states that "between 1-1-2013 and October 2014 . . . [defendants] threatened to kill me without regard to any penological reason, calculated to harass me, humiliate me, abuse their power and cause unnecessary and wanton pain as punishment for my past confrontation with CO Thomas Belz" and that "[b]etween 7-25-2013 and 10-2-2014 [defendants] came to my cell routinely taunting and threatening me stating the use of the electronic taser on me on 7-25-2013 and 8-12-2013 fried me like a chicken and its not over they are going to kill me." Dkt. 148, at 1, 3. At his deposition, plaintiff had difficulty recalling individual incidents but did assert that each defendant involved in this claim made threats against him.

Defendants argue that these threats fall on the "harassment" side of the *Dobbey* analysis, in part because plaintiff's description of the threats are vague. But plaintiff has attached to his affidavit inmate grievances that detail the nature of the threats. Dkt. 148-1, at 1 (on December 23, 2014, defendants Gallinger, Parr, and Belz said "they were going to kill [plaintiff's] 'black ass'"; Dkt. 148-2, at 1 (on November 20, 2013, Gallinger and Parr threatened to attack plaintiff while he was handcuffed to his cell); Dkt. 148-3, at 1 (on March 1, 2014, defendant Kersten threatened to kill plaintiff). Defendants provide more grievances filed by plaintiff, some of which support his claims about the threats as well. *See, e.g.*, Dkt. 114-9, at 1 (On February 9, 2014, Parr said "he wanted to get it over with" by assaulting plaintiff while he was handcuffed and "beat [his ass]."); Dkt. 114-10, at 2 (On March 17, 2014, defendant Scullion told plaintiff "you['re] not going home we are going to kill you before you do"). Defendants are correct that at least some of the threats contained in plaintiff's grievances have to do with his outlandish claims that prison staff introduced toxic

gas into his cell, *see e.g.*, Dkt. 114-3, at 15, Dkt. 114-4, at 1; *see also Simpson v. Haines*, No. 11-cv-851-bbc (W.D. Wis. Apr. 29, 2013) (summary judgment granted to prison officials after concluding that "the facts in the summary judgment record are vastly different from the allegations in plaintiff's complaint that he was constantly being illicitly sprayed with 'toxic chemicals'"). But these examples do not defeat his claims where he has made other, plausible allegations of threats.

Defendants also argue that the threats are not "credible" because they were not backed by any physical violence. Plaintiff discusses three alleged assaults, taking place July 25, 2013, August 12, 2013, and June 24, 2014. Defendants argue that none of these incidents should be considered, because plaintiff failed to exhaust his administrative remedies regarding the July 25, 2013 incident; because summary judgment should be granted on plaintiff's excessive force and strip search claims regarding the August 12, 2013 incident; and because the June 24, 2014 incident cannot support plaintiff's claims because it postdates plaintiff's amended complaint.

I conclude that a reasonable jury could conclude that the threats were credible because they were backed by violence. Plaintiff's claim is for the *threats* made by defendants, and defendants do not argue that plaintiff failed to exhaust administrative remedies about the threats themselves. Although plaintiff uses the acts of violence against him to show that the threats against him are "credible," I see no reason to force him to exhaust grievances about both the threats and connected attacks to bring a claim about the threats. Plaintiff is free to use the attacks as evidence supporting his claim.

Defendants' argument regarding the August 12, 2013 incident assumes that summary judgment would be granted to them on the underlying claims concerning that incident.

Because I am denying defendants' motion for summary judgment on those claims, the incident clearly serves to bolster plaintiff's threat claim.

These first two alleged assaults are sufficient to prove the threats to be credible, making it unnecessary to decide whether plaintiff may use the June 24, 2014 incident postdating his complaint as evidence that the threats were credible. As for whether plaintiff may use this alleged attack as evidence at trial, the issue should be taken up by the parties in their motions in limine.

Defendants argue that qualified immunity should apply to plaintiff's threats claim, but even given the "fuzzy" nature of this sort of claim, plaintiff has alleged that defendants have violated clearly established law. No reasonable officer would think that it was lawful to repeatedly threaten a prisoner with harm or death as part of a scheme of severe harassment backed by actual assaults of the prisoner. Accordingly, I will deny defendants' motion for summary judgment on these claims.

## D. Failure to consider grievances

Plaintiff also brings claims against defendants Brown and Ray for ignoring his prison grievances about the use of force and threats against him. However, the records submitted by the parties show that, pursuant to DOC policies, they forwarded the grievances on to security staff when plaintiff followed procedure by making a statement about the incident. They dismissed the grievances when plaintiff would not provide a statement. This is all they were required to do. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) (Claim against complaint examiner fails where prisoner "has not accused [examiner] of refusing to do her job and of leaving the prisoners to face risks that could be averted by faithful implementation of

the grievance machinery. He contends, instead, that [examiner] should be held liable because she carried out her job exactly as she was supposed to.").

Plaintiff does not present any evidence raising a dispute of material fact about Brown's and Ray's actions. Plaintiff argues that he does not believe the testimony of investigating security staff and contends that his complaints should not have been dismissed after he failed to give a statement. But he provides no evidence suggesting that Brown, Ray, or any of the security staff lied about the progression of plaintiff's various grievances. Nor is he correct in his interpretation of the procedure for processing this type of grievance—the policy explicitly states that "[r]efusal of the interview, refusal to provide details or refusal to sign the statement shall result in dismissal of the complaint." Dkt. 114-1, at 2. Because plaintiff has presented no evidence suggesting that Brown or Ray left him "to face risks that could be averted by faithful implementation of the grievance machinery," I will grant defendants' motion for summary judgment on this claim.

## E. Injunctive relief

In the March 30, 2015 order, I partially denied plaintiff's motion for preliminary injunctive relief but addressed his requests for transfer from WSPF and no future contact with the defendants. Dkt. 98, at 17. I questioned whether plaintiff's requests were moot in light of his transfer out of WSPF, stating as follows:

> Usually, "when a prisoner who seeks injunctive relief for a condition specific to a particular prison is transferred out of that prison, the need for relief, and hence the prisoner's claim, become moot." *Lehn v. Holmes*, 364 F.3d 862, 871 (7th Cir. 2004). However, a claim may not be mooted if the prisoner can show "a realistic possibility that he will again be incarcerated in the same state facility and therefore be subject to the actions of which he complains here." *Maddox v. Love*, 655 F.3d 709, 716 (7th Cir. 2011). Given WSPF's role as a facility for inmates with behavioral problems, coupled with allegations in both the

31

> present case and past litigation in this court that plaintiff is a security risk, it seems possible that plaintiff could indeed find himself back at WSPF in short order. I will grant plaintiff's motion to file a reply brief to give him a chance to explain why he thinks he will end up back at WSPF. Defendants will be given a chance to respond.

*Id.*, at 18. The parties' submissions do not raise any concerns that plaintiff is in immediate danger of being placed back at WSPF before trial, so I will deny his motion for preliminary injunctive relief. If the unexpected occurs and plaintiff is scheduled to be moved back to WSPF before trial, I expected to be apprised of that fact by defendants.

Plaintiff's request for injunctive remedies should he prevail on his claims remains part of the case to be resolved at trial.

**F.  Schedule**

Defendants have submitted a motion to stay the remaining pretrial deadlines and November 9, 2015 trial date. I will grant that motion and set a new schedule as follows:

- Rule 26(a)(3) disclosures, motions in limine, proposed voir dire, proposed jury instructions, and proposed verdict forms: November 16, 2015

- Objections to the above submissions: December 2, 2015

- Final Pretrial Conference: December 14, 2015 at 8:30 a.m.

- Trial: December 14, 2015 at 9:00 a.m.

ORDER

IT IS ORDERED that:

1.  Plaintiff Willie Simpson's motions for an extension of time to file his summary judgment response, Dkt. 138 and 142, are DENIED as moot.

32

2.     Plaintiff's Eighth Amendment claim regarding the July 25, 2013 strip search is DISMISSED without prejudice for plaintiff's failure to exhaust his administrative remedies.

3.     Defendants' motion for summary judgment, Dkt. 110, is DENIED with respect to the following claims:

   a.   Defendants Dane Esser, Wayne Primmer, Theran Gage, Chad Winger, and Christopher Foley used excessive force by tasing plaintiff on August 12, 2013.

   b.   Defendants Esser, Primmer, Gage, Winger, and Foley chose to conduct a staff-assisted strip search of plaintiff on August 12, 2013 for the purpose of humiliating him.

   c.   Defendants Esser, Primmer, Gage, Winger, Foley, and Lucas Runice forced plaintiff to crawl into his cell on August 12, 2013 for the purpose of humiliating him.

   d.   Defendants Travis Parr, Shawn Gallinger, C.O. Godfrey, Esser, Thomas Belz, Foley, Michael Sherman, Michael Cockcroft, Leverne Wallace, Mathew Scullion, Keith Weigel, and CO Kersten threatened to harm and kill plaintiff.

4.     Defendants' motion for summary judgment is GRANTED with respect to the remainder of plaintiff's claims. Defendants Sara Mason, Captain Flannery, Ronald Torgerson, Ellen Ray, and William Brown are DISMISSED from the lawsuit.

5.     Plaintiff's motion for preliminary injunctive relief, Dkt. 81, is DENIED.

6.     Defendants' motion to stay the remaining pretrial deadlines and trial date, Dkt. 153, is GRANTED. The schedule is amended as provided in the opinion above.

Entered October 9, 2015.

                    BY THE COURT:

                    /s/

                    _____
                    JAMES D. PETERSON
                    District Judge

33